## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:

**DANIEL JOYCE and**
**ROBERT LOPEZ,**
      **Plaintiff,**

v.

**NORTH METRO TASK FORCE,**
**THE CITY OF NORTHGLENN, COLORADO,**
**THE CITY OF THORNTON, COLORADO,**
**JAMES NURSEY, CHIEF, THORNTON POLICE DEPARTMENT**, in his official and
      individual capacities,
**RUSSELL VAN HOUTEN, CHIEF, NORTHGLENN POLICE DEPARTMENT**, in his
      official and individual capacities,
**JACK BELL,** in his official and individual capacities,
**DANTE CARBONE,** in his official and individual capacities,
**TIMOTHY HERSEE,** in his official and individual capacities, and
**RICHARD REIGENBORN,** in his official and individual capacities,
      **Defendants.**

---

## COMPLAINT

---

Daniel Joyce and Robert Lopez, by and through their undersigned attorneys, hereby bring

this Complaint against the above-named defendants.

## I.  INTRODUCTION

1.     On November 20, 2009, Dan Tang pled guilty to charges of drug conspiracies

after a lengthy and extensive investigation by the Drug Enforcement Agency ("DEA") and the

North Metro Task Force ("the Task Force").  As widely reported by the media, the investigation

was potentially compromised by a letter warning Tang about the investigation.  It was suspected

that the letter came from a police officer on the Task Force.

2.      When an investigation was started by the DEA into the letter, several detectives in the North Metro Task Force cooperated with the DEA in the investigation and urged others to cooperate.  Rather than commending the officers for acting responsibly, the Task Force and its member organizations and officials retaliated against the officers.

3.      This case is brought by those officers to vindicate their rights under the First Amendment to the U.S. Constitution.

## II.   JURISDICTION

4.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. §1983.  The Court has original jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§451, 1331, 1337, and 1343.

5.      Venue for this action properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

## III.   PARTIES

6.      Daniel Joyce ("Joyce") is an individual, a resident of Colorado, and at all times relevant to this complaint, a police officer with the Northglenn Police Department.

7.      Robert Lopez ("Lopez") is an individual, a resident of Colorado, and at all times relevant to this complaint, a police officer with the Thornton Police Department.

8.      The North Metro Task Force ("Task Force") is an entity created under Colorado law, comprised of Adams County and the City and County of Broomfield, and the Cities of Brighton, Commerce City, Northglenn, Federal Heights, Thornton and Westminster, and managed by a board of directors comprised of the Chiefs and Sheriff of participating agencies, including defendants Russell Houten and James Nursey.

9.     The City of Northglenn, Colorado ("City of Northglenn"), is a municipality duly organized and constituted under the laws of the State of Colorado.

10.     The City of Thornton, Colorado ("City of Thornton"), is a municipality duly organized and constituted under the laws of the State of Colorado.

11.     James Nursey ("Nursey") is an individual, a resident of Colorado, and at all times relevant to this complaint, the Chief of the Thornton Police Department, a Department of the City of Thornton, Colorado.

12.     Russell Van Houten ("Van Houten")  is an individual, a resident of Colorado, and at all times relevant to this complaint, the Chief of the Northglenn Police Department, a Department of the City of Northglenn, Colorado.

13.     Jack Bell ("Bell") is an individual, a resident of Colorado, and at all times relevant to this complaint, was (i) a sergeant with the Westminster Police Department, (ii) assigned to the North Metro Drug Task Force, and (iii) a supervisor of plaintiffs Joyce and Lopez.

14.     Dante Carbone ("Carbone") is an individual, a resident of Colorado, and at all times relevant to this complaint, was (i) a sergeant with the Thornton Police Department, (ii) assigned to the North Metro Drug Task Force, and (iii) a supervisor of plaintiffs Joyce and Lopez.

15.     Timothy Hersee ("Hersee") is an individual, a resident of Colorado, and at all times relevant to this complaint, was (i) a commander with the Broomfield Police Department, (ii) assigned to the North Metro Drug Task Force as Commander, and (iii) a supervisor of plaintiffs Joyce and Lopez.

16.     Richard Reigenborn ("Reigenborn") is an individual, a resident of Colorado, and at all times relevant to this complaint, was (i) a sergeant with the Adams County Sheriff's Department, (ii) assigned to the North Metro Drug Task Force, and (iii) a supervisor of plaintiffs Joyce and Lopez.

## IV.  GENERAL FACTUAL ALLEGATIONS

17.     The North Metro Task Force is (i) a multi-jurisdictional entity composed of Adams County and the City and County of Broomfield, and the Cities of Brighton, Commerce City, Northglenn, Federal Heights, Thornton and Westminster, (ii) governed by a board of directors comprised of the Chiefs and Sheriff of participating agencies, including defendants Russell Houten and James Nursey, and (iii) targeting street level drug violators and investigating major drug distribution groups identified through street level investigations, (iv) to which each of the participating agencies assigns officers.

18.     Plaintiff Joyce is an officer with the Northglenn Police Department and was assigned to the North Metro Task Force from January 2007 until August 2008 to perform investigations concerning illegal drug use, sales and manufacturing.

19.     Plaintiff Lopez is an officer with the Thornton Police Department and was assigned to the North Metro Task Force from September, 2003, to August, 2008 to perform investigations concerning illegal drug use, sales and manufacturing.

20.     On or about July 17, 2007, the North Metro Task Force, and specifically Detective Joyce initiated an investigation into a major drug growing and distribution operation; Plaintiff Joyce being designated as lead investigator in that investigation.

4

21.     On or about February 13, 2008, a letter was sent to a principal subject of the investigation by an anonymous source (hereinafter "the letter" or "the leak").  From the detailed contents of the letter, it was determined that the letter most likely came from a source inside the Task Force.  As a result, an investigation into the letter was initiated by the federal Drug Enforcement Agency ("DEA").

## V.   FACTUAL ALLEGATIONS AS TO DETECTIVE JOYCE

### *Speech About Matters of Public Concern*

22.     Plaintiff Joyce spoke out about corruption within the Task Force, including, but not limited to possible leaks from members of the Task Force to drug suspects, to persons both within and outside of the Task Force.  For example:

   a.     On or about April of 2008, the DEA contacted the Task Force about the investigation into the letter sent to drug suspects.

   b.     Plaintiff Joyce spoke with DEA investigators as part of the agency's investigation into the leak, as well as on numerous other occasions, outside of that investigation, about corruption within the Task Force.

   c.     Starting in April of 2008, Plaintiff Joyce, in numerous meetings and individual conversations, spoke about corruption, including but not limited to the leak, to Internal Revenue Service agents and HIDTA (High Intensity Drug Trafficking Area) analysts, among others.

23.     Plaintiff Joyce spoke out about the necessity and advisability of cooperating with and aiding in federal investigations of corruption within the Task Force, including, but not

limited to possible leaks from members of the Task Force to drug suspects, to persons both within and outside of the Task Force; for example:

a.   On or about April of 2008, the DEA contacted the Task Force about the investigation into the letter sent to drug suspects.

b.   The position of supervisors within the Task Force was **not** to cooperate in the investigation.

c.   Plaintiff Joyce spoke with other officers assigned to the Task Force, as well as his supervisors, about cooperation with federal investigators, urging them to do so.

d.   Starting in April of 2008, Plaintiff Joyce, in numerous meetings and individual conversations, spoke with federal employees about cooperation with federal investigators, urging them to do so.

24.   Plaintiff Joyce also spoke out about the failure of the Task Force and/or its refusal to adequately investigate and prosecute government officials and business persons associated with illegal drug activities.

a.   Starting in April of 2008, Detective Joyce raised numerous concerns about the conduct by the Task Force of drug investigations into Dan Tang and associates, including, but not limited to the failure to prosecute certain government officials and prominent businessmen,  a failure that persists until the present time.

b.   Detective Joyce raised those concerns within the Task Force to officers assigned to the Task Force and to supervisors, as well as to persons outside

of the Task Force, including, but not limited to other members of the police departments comprising the Task Force, DEA agents, assistant united states attorneys, and former and present Adams County district attorneys and assistant district attorneys.

### *Retaliation Against Plaintiff Joyce*

25.     Immediately after he started speaking out about the matters of public concern discussed above, Task Force officials began a series of retaliatory actions, including but not limited to unfounded disciplinary actions against Plaintiff Joyce in retaliation for that speech, including but not limited to the following:

a.     Prior to April of 2008, Detective Joyce had no disciplinary actions on his record.

b.     In May of 2008, Detective Joyce was verbally reprimanded by one of his supervisors, defendant Bell, without any reason, purportedly for spending too much time on a major drug case that he had initiated.

c.     In July of 2008, Detective Joyce's supervisor, defendant Bell, told Joyce that the supervisor would start documenting his alleged performance problems.

d.     In July of 2008, defendant Bell subjected Detective Joyce to performance requirements to which other detectives were not subjected.

e.     In July of 2008, Detective Joyce was verbally reprimanded by defendant Bell specifically for answering questions about the Task Force leak.

f.    In July of 2008, Detective Joyce was subjected to other unfounded

disciplinary actions that damaged his reputation and professional standing.

26.    Immediately after he started speaking out about the matters of public concern

discussed above, Task Force officials took actions creating intolerable working conditions for

Detective Joyce in retaliation for that speech, including but not limited to the following.

a.    In April of 2008, Detective Joyce's supervisors, defendants Bell and

Carbone removed substantial parts of a major drug case Joyce had initiated

from him without reason, later taking away the entire case, to the

detriment of the case.

b.    Starting in May of 2008,  defendant Hersee warned Detective Joyce not to

cooperate with federal officials about the leak, and, in June of 2008,

Hersee told Detective Joyce several times to keep quiet.

c.    Starting in May of 2008, defendant Reigenborn, one of Detective Joyce's

supervisors, watched him wherever he went, even after his return to his

home police department, Northglenn Police Department.

d.    In June of 2008, defendants Bell, Carbone, and Reigenborn moved

Detective Joyce away from other members of the Task Force with whom

he worked, as punishment for "spreading rumors."

e.    In June of 2008, the supervisor of the Task Force, defendant Hersee,

publicly reprimanded Detective Joyce for talking with the DEA.

f.    In June of 2008, Detective Joyce learned that other detectives had been

told not to share certain information about his cases with him.

8

g.     In June of 2008, Detective Joyce's supervisor, defendant Bell, refused to allow him to take necessary actions in a major case being handled by Joyce.

h.     Detective Joyce's supervisors, defendants Bell and others, generally spoke to him in a demeaning manner, and spoke about him to other officers in a demeaning and undermining fashion.

i.     Task Force officials subjected Detective Joyce to workplace harassment, emotional abuse and possible physical danger by the Task Force's refusal to immediately remove persons who were suspected of leaking information to suspects in major drug cases from positions of supervision and active participation in the case.

j.     Detective Joyce's home was under surveillance by unknown persons.

27.     Detective Joyce spoke, on numerous occasions, with the Task Force supervisor, defendant Hersee, and the Chief of the Northglenn Police Department, defendant Van Houten, about the retaliation he suffered.  Both refused to take any action to remedy the situation.

28.     In July of 2008, Detective Joyce attempted to file a formal complaint with Northglenn Police Department about the retaliation, but was told by Paula Jensen, the Human Resources Director, that he could not do so.  He also tried to file a complaint with Broomfield Police Department but was told by Susie Smith, the Human Resources Director, that he could not do so.

29.     As a result of the intolerable working conditions and possible physical danger to which he was subjected by the refusal of Defendants to remove those suspected of corruption,

9

including leaking information to drug suspects, Detective Joyce was forced to leave the North

Metro Task Force.

### *Municipal Policy, Custom and/or Practice*

30.     The North Metro Task Force has engaged in a wide-spread practice and/or custom

of retaliating against officers who speak out about wrong-doing on the part of the Task Force.

Officers and employees other than the plaintiffs here have been subject to retaliation for speaking

out, one example being Lynn Riemer, the Chemist for the Task Force, who was also forced out of

the Task Force.

31.     Defendant Van Houten is the Chief of the Northglenn Police Department, a

department created by the City of Northglenn, Colorado.  Under relevant municipal ordinances,

the City of Northglenn has appointed Defendant Van Houten as the final decision maker on all

issues involving employees of the Northglenn Police Department.

32.     As noted above, Detective Joyce informed Defendant Van Houten about the

retaliation that was being taken against him, but, no action was or has been taken to remedy the

wrong-doing.

33.     As noted above, Detective Joyce attempted to file a formal complaint with

Northglenn Police Department about the retaliation, but was told by Paula Jensen that he could

not do so.

34.     Despite warnings from Detectives Joyce and Lopez, the Chiefs of Police

comprising the Board of Governors of the Task Force refused to take action in response to

allegations of corruption and allowed the main suspect in the federal investigation into the leak in

the Tang case to stay in a supervisory position at the Task Force, thus allowing him to remain in

a position to control the further investigation of the case, and the lives of the officers involved in the investigation, including detectives Lopez and Joyce. .

35.     In April of 2009, after intervention by his attorney, Detective Joyce was allowed to file a formal complaint with the North Metro Task Force and the Northglenn Police Department concerning the retaliatory actions taken against him.  Despite promises of an investigation, no action has been taken with regard to his complaints.

*Effects of Defendants' Actions*

36.     As a result of Defendants' harassment and retaliation,  as described above, Detective Joyce has suffered and continues to suffer economic damages from the actions of the Defendants, including, but not limited to loss of income and benefits, and the necessity of incurring substantial attorney's fees and costs.

37.     The Defendants' actions in forcing Detective Joyce out of the Task Force resulted in loss of income, loss of prestige, loss of reputation, and loss of promotion potential, among other losses.

38.     As a result of Defendants' harassment and retaliation,  as described above, Detective Joyce has suffered emotional and physical damages, including, but not limited to depression, loss of sleep, loss of appetite, loss of enjoyment of life, stomach problems, headaches, and nausea.

## VI.   FACTUAL ALLEGATIONS AS TO DETECTIVE LOPEZ

### *Speech About Matters of Public Concern*

39.     Plaintiff Lopez spoke out about corruption within the Task Force, including, but not limited to possible leaks from members of the Task Force to drug suspects, to persons both within and outside of the Task Force; for example:

a.      On or about April of 2008, the DEA contacted the Task Force about the investigation into the letter sent to drug suspects.

b.      Plaintiff Lopez spoke with DEA investigators as part of the agency's investigation into the leak, as well as on numerous other occasions outside of that investigation, about corruption within the Task Force, including but not limited to his concerns about irregular and suspicious behaviors of his supervisor, known and obvious conflicts of interests on the part of his supervisor, illegal activities on the part of persons prior to the actual arrest of Dan Tang, including exposure of the identities of undercover detectives to Tang, and directions not to affect the arrest of Tang or others in his organization.

c.      Starting in April of 2008, Plaintiff Lopez, in numerous meetings and individual conversations, spoke out about corruption within the Task Force.

40.     Plaintiff Lopez spoke out about the necessity and advisability of cooperating with and aiding in federal investigations of corruption within the Task Force, including, but not

limited to possible leaks from members of the Task Force to drug suspects, to persons both within and outside of the Task Force; for example:

    a.    On or about April of 2008, the DEA contacted the Task Force about the investigation into the letter sent to drug suspects.

    b.    The position of supervisors within the Task Force was **not** to cooperate in the investigation.

    c.    Plaintiff Lopez spoke with other officers assigned to the Task Force, as well as his supervisors, about cooperation with federal investigators, urging them to do so.

    d.    Starting in April of 2008, Plaintiff Lopez, in numerous meetings and individual conversations, spoke about importance of cooperating with federal investigators, urging others to do so.

41.    Plaintiff Lopez also spoke out about and criticized the decision of Task Force officials to stop working with the federal authorities on drug cases.

    a.    After the investigation into the letter was initiated by the DEA, various chiefs of police and other officials, including defendants Hersee, Carbone, Reigenborn and Bell, decided to stop working with the DEA on drug cases.

    b.    Starting in June of 2008, Detective Lopez spoke out about and criticized the decision to stop working with the DEA.

42.    Plaintiff Lopez also spoke out about the failure of the Task Force and individual police agencies to provide officers with adequate protective clothing in drug raids; for example:

a.   In the course of the drug investigation into Dan Tang and associates, detectives Joyce and Lopez were required to go into houses in which large amounts of marijuana were grown.

b.   In February of 2008, a chemist with the Task Force, Lynn Riemer, researched and wrote at least one memorandum to supervisors raising issues about the health effects of seizing certain drugs and asking that protective clothing and equipment for officers doing marijuana searches and seizures.

c.   Starting in February of 2008, Detective Lopez raised serious issues about dismantling marijuana grows without appropriate protective equipment, and asked that the appropriate protective equipment be used and Task Force policy be created and standards be set for all future searches and seizures, speaking to Defendant Carbone, among others. No action was taken to provide protective clothing.

*Retaliatory Acts*

43.   After he started speaking out about the matters of public concern discussed above, Task Force officials began a series of adverse actions, including but not limited to unfounded disciplinary actions against Plaintiff Lopez in retaliation for that speech, including but not limited to the following.

a.   On June 24, 2008, Task Force officials, including defendants Carbone and Chief Nursey and Deputy Chief Randy Nelson, removed Detective Lopez from the Task Force without reason, causing damage to his reputation and

14

ability to secure future promotions and other job opportunities.

b.    Detective Lopez was removed from the Task Force despite the fact that his position was designated as, and repeatedly referred to as a "core" position within the Task Force, core positions not rotating with the same frequency as other positions.

44.    After he started speaking out about the matters of public concern discussed above, Task Force officials took actions creating intolerable working conditions for Detective Lopez in retaliation for that speech, including but not limited to the following:

a.    Generally, Detective Lopez's supervisors, defendants Carbone, Reigenborn and Bell started speaking to him in a demeaning manner, comments overheard by other members of the Task Force.

b.    Starting in April of 2008, Detective Lopez' supervisors, defendants Carbone, Reigenborn and Bell, continuously told Lopez to keep quiet about the Task Force leak and working with the DEA, or, he would be removed from the Task Force.

c.    In June of 2008, defendants Carbone, Reigenborn and Bell moved Detective Lopez away from other members of the Task Force with whom he worked, as punishment for "spreading rumors and negatively affecting morale."

d.     Defendants Carbone and Reigenborn publically reprimanded Detective Lopez without cause, purportedly for spending "too much time" on a major drug case.

15

e.     In December of 2008, the Chief of the Thornton Police Department,

defendant Nursey, publicly called Detective Lopez and others who

cooperated with the DEA in the investigation of the Task Force leak

"rogue" and "self-righteous" police who were "friends with criminals."

f.     Task Force officials Commander Hersee, and sergeants Carbone,

Reigenborn and Bell subjected Detective Lopez to workplace harassment,

emotional abuse and possible physical danger by the failure and/or refusal

to immediately remove persons who were suspected of leaking

information to suspects in major drug cases from positions of supervision

and active participation in the case.

45.     Detective Lopez spoke, on numerous occasions, with the Task Force supervisor,

Commander Tim Hersee, and Deputy Chief Randy Nelson, and the Chief of the Thornton Police

Department, Defendant Nursey about the retaliation he suffered.  All refused to take any action to

remedy the situation.

46.     Rather, in December of 2008, the defendant Nursey publicly called Detective

Lopez and others who cooperated with the DEA in the investigation of the Task Force leak

"rogue" and "self-righteous" police who were "friends with criminals."

47.     Despite warnings from Detective Lopez, the Chiefs of Police comprising the

Board of Governors of the Task Force, especially Chief Jim Nursey, as the Chief of the Thornton

Police Department, refused to respond to allegations of corruption and allowed the main suspect

in the federal investigation into the leak in the Tang case, to stay in a supervisory position at the

Task Force, thus allowing him to remain in a position to control the further investigation of the

case, and the lives of the officers involved in the investigation, including detectives Lopez and

Joyce.

<em>Municipal Policy, Custom and/or Practice</em>

48.     The North Metro Task Force has engaged in a wide-spread practice and/or custom

of taking retaliatory actions against officers who speak out about wrong-doing on the part of the

Task Force.  Officers and employees other than the plaintiffs here have been subject to retaliation

for speaking out, one example being Lynn Riemer, the Task Force Chemist, was forced out of the

Task Force.

49.     Defendant Nursey is the Chief of the Thornton Police Department, a department

created by the City of Thornton, Colorado.  Under relevant municipal ordinances, the City of

Thornton has appointed Defendant Nursey as the final decision maker on all issues involving

employees of the Thornton Police Department.

50.     As noted above, Detective Lopez informed Defendant Nursey, the Chief of the

Thornton Police Department and the final decision maker on all issues involving employees of

the Thornton Police Department, about the retaliation that was being taken against him, but, no

action was or has been taken by Defendant Nursey to remedy the wrong-doing.  Instead,

Defendant Nursey publicly ridiculed and humiliated Plaintiff Lopez.

51.     In April of 2009, after the intervention of his attorney, Detective Lopez was

allowed to file a formal complaint with the North Metro Task Force and the Thornton Police

Department concerning the retaliatory actions taken against him.  Despite promises of an

investigation, no action has been taken with regard to his complaints.

*Effects of Defendants' Actions*

52.     As a result of Defendants' harassment and retaliation,  as described above, Detective Lopez has suffered and continues to suffer economic damages from the actions of the Defendants, including, but not limited to loss of income and benefits, and the necessity of incurring substantial attorney's fees and costs.

53.     Defendants' actions in transferring Detective Lopez out of the Task Force resulted in loss of income, loss of prestige, loss of reputation, and loss of promotion potential, among other losses.

54.     As a result of Defendants' harassment and retaliation,  as described above, Detective Lopez has suffered emotional and physical damages, including, but not limited to depression, loss of sleep, loss of appetite, loss of enjoyment of life, stomach problems, headaches, and nausea.

## VII.  EFFORTS TO RESOLVE ISSUES

55.     Plaintiffs Joyce and Lopez have tried for almost two years to resolve their claims informally with the Defendants to no avail.  At this point, litigation is the only option to remedy their claims.

## VIII.  VIOLATIONS ALLEGED

56.     As to each of the following claims for relief, paragraphs 1 through 55 above are incorporated by reference and re-alleged as if fully set forth in each separate claim.

## FIRST CLAIM FOR RELIEF AS TO PLAINTIFF JOYCE
### Abridgment of First Amendment Freedom of Speech
### Pursuant to 42 U.S.C. §1983

57.     Plaintiff Joyce exercised his right to freedom of speech as afforded by the First Amendment to the United States Constitution by speaking out on matters of public concern.

58.     Plaintiff Joyce's speech was not expressed pursuant to his official duties.

59.     The value of Plaintiff Joyce's speech outweighs any possible negative or destructive impact on Defendants' performance of public functions.

60.     The Defendants intentionally and willfully retaliated against Plaintiff Joyce for exercising his freedom of speech.

61.     Defendants' retaliatory conduct was substantially motivated by Plaintiff Joyce's exercise of freedom of speech.

62.     Defendants' conduct violated the clearly established rights of Plaintiff Joyce, of which persons in Defendants' positions should have known.

63.     The aforementioned conduct represented the official custom, policy or practice of Defendants.

64.     Defendants' conduct was willful and wanton and engaged in maliciously or with reckless disregard or callous indifference to Plaintiff Joyce's protected rights, as well as to his rights and feelings.

65.     As a result of Defendants' misconduct, Plaintiff Joyce has been damaged.

## SECOND CLAIM FOR RELIEF AS TO PLAINTIFF LOPEZ
### Abridgment of First Amendment Freedom of Speech
### Pursuant to 42 U.S.C. §1983

66.     Plaintiff Lopez exercised his right to freedom of speech as afforded by the First Amendment to the United States Constitution by speaking out on matters of public concern.

67.     Plaintiff Lopez's speech was not expressed pursuant to his official duties.

68.     The value of Plaintiff Lopez's speech outweighs any possible negative or destructive impact on Defendants' performance of public functions.

69.     The Defendants intentionally and willfully retaliated against Plaintiff Lopez for exercising his freedom of speech.

70.     Defendants' retaliatory conduct was substantially motivated by Plaintiff Lopez's exercise of freedom of speech.

71.     Defendants' conduct violated the clearly established rights of Plaintiff Lopez, of which persons in Defendants' positions should have known.

72.     The aforementioned conduct represented the official custom, policy or practice of Defendants.

73.     Defendants' conduct was willful and wanton and engaged in maliciously or with reckless disregard or callous indifference to Plaintiff Lopez's protected rights, as well as to his rights and feelings.

74.     As a result of Defendants' misconduct, Plaintiff Lopez has been damaged.

## IX.   PRAYER FOR RELIEF

A.      In view of all of the preceding, Plaintiffs Joyce and Lopez respectfully request that this Court enter judgment in each of their behalf and against Defendants and award each the following:

(1)     Injunctive and declaratory relief, including but not limited to a declaration that the conduct alleged is violative of federal law and of the rights of Detectives Joyce and Lopez thereunder;

(2)     Prospective relief as allowed by law;

(3)     Where allowed by law, damages in such amount as will be proven at trial for back pay, and other damages, including but not limited to lost wages, benefits promotions, seniority and other employment opportunities;

(4)     Where allowed by law, an Order that Defendants transfer Plaintiffs Joyce and Lopez back to the North Metro Task Force, or, in the alternative, for Defendants to pay front-pay and benefits in an appropriate amount;

(5)     Compensatory damages, including but not limited to emotional distress, as allowed by law;

(6)     Where allowed by law, punitive or exemplary damages;

(7)     Attorneys fees and costs as provided by law;

(8)     Pre- and post judgment interests costs; and

B.      Plaintiffs Joyce and Lopez have such other, further and different relief as this Court deems just and proper.

21

## X.   DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury.

**Dated** this 18th day of March, 20010.

Respectfully submitted:

*s/Patricia S. Bangert*

_____

Patricia S. Bangert, #20541,
Attorney at Law, LLC
3773 Cherry Creek North Drive, Suite 575
Denver, Colorado 80209
Phone:  (303) 228-2175
Fax: (303) 399-6480
Email: trishbang@aol.com
**Attorney for Plaintiffs Joyce and Lopez**

Addresses of Plaintiffs:
[The addresses are suppressed in light of
plaintiffs' status as police officers]