**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 10-cv-00649-CMA-MJW

DANIEL JOYCE, and
ROBERT LOPEZ,

      Plaintiffs,

v.

NORTH METRO TASK FORCE,
THE CITY OF NORTHGLENN, COLORADO,
THE CITY OF THORNTON, COLORADO,
JAMES NURSEY, CHIEF, THORNTON POLICE DEPARTMENT,
   in his official and individual capacities,
RUSSELL VAN HOUTEN, CHIEF, NORTHGLENN POLICE DEPARTMENT,
   in his official and individual capacities,
JACK BELL, in his official and individual capacities,
DANTE CARBONE, in his official and individual capacities,
TIMOTHY HERSEE, in his official and individual capacities, and
RICHARD REIGENBORN, in his official and individual capacities,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DENYING OTHER PENDING FILINGS AS MOOT**

---

     This matter is before the Court on motions for summary judgment filed by

Defendants the City of Northglenn, Colorado and Russell Van Houten (Doc. # 41);

Defendants North Metro Task Force and Richard Reigenborn (Doc. # 43); Defendants

the City of Thornton, Colorado, James Nursey, and Dante Carbone (Doc. # 47);

Defendant Timothy Hersee (Doc. # 48); and Defendant Jack Bell (Doc. # 49).  The motions have been fully briefed[1] and are ripe for adjudication.

Also pending before the Court are (1) Defendants' Objection to Magistrate Judge's Order Regarding Plaintiffs' Motion for Order Compelling Production of Subpoenaed Documents and Testimony (Doc. # 127), to which Plaintiffs have filed a Response (Doc. # 128); and (2) Defendants City of Thornton, Nursey, and Carbone's Motion *in Limine* (Doc. # 129).

For the following reasons, Defendants' motions for summary judgment are GRANTED, and Defendants' Objection to the magistrate judge's discovery order and the motion in limine are DENIED as moot.

## I.  BACKGROUND

The following facts do not appear to be in dispute.

Plaintiff Joyce is a police officer with the City of Northglenn, Colorado, and from January 2007 to July 2008 was a detective with the North Metro Task Force ("NMTF"). (Doc. # 42, at 2, ¶ 3; Doc. # 77, at 1, ¶ 3.)  Plaintiff Lopez is a police officer with the City of Thornton, Colorado, and from November 2003 to September 2008 was a detective with the NMTF.  (Doc. # 42, at 2, ¶ 4; Doc. # 77, at 1, ¶ 4.)  The NMTF is a governmental entity created under Colorado law that is made up of eight cities and

---

[1]   Defendants have also filed a Unified Statement of Undisputed Facts in support of their motions (Doc. # 42).  Plaintiffs Daniel Joyce and Robert Lopez have filed Responses and a Statement of Additional Undisputed Facts (Doc. ## 72 - 77).  Defendants have filed Reply Briefs and a Response to Plaintiffs' Statement of Additional Undisputed Facts (Doc. ## 98 - 99, 101 - 103, 109).  Plaintiffs have filed Sur-Reply Briefs as to three of the motions, and as to Defendants' Unified Statement of Undisputed Facts (Doc. ## 118 - 121).

counties in Colorado, including Northglenn and Thornton.  (Doc. # 42, at 1, ¶ 1; Doc.,
# 77, at 1, ¶ 1.)  Defendants Van Houten and Nursey, the Chiefs of Police for
Northglenn and Thornton, respectively, are on the Governing Board for the NMTF
("Board").  (Doc. # 42, at 1-2, ¶ 1; Doc. # 77, at 1, ¶ 1.)  During the relevant underlying
events, Defendant Hersee was the commander of the NMTF, while Defendants Bell,
Carbone, and Reigenborn were sergeants for the NMTF.  (Doc. # 42, at 2, ¶ 2; Doc.
# 77, at 1, ¶ 2.)

Around July 2007, while working for the NMTF, Joyce initiated an investigation
of a large-scale marijuana growing operation involving Dan Tang, a restauranteur in
Thornton ("Tang investigation").  (Doc. # 42, at 2, ¶ 6; Doc. # 77, at 1-2, ¶ 6.)  The
investigation was of such magnitude that federal agencies got involved:  Joyce and
the NMTF worked with the U.S. Drug Enforcement Administration ("DEA"), Agent Ken
Valdez from the U.S. Internal Revenue Service ("IRS"), and Analyst Karen Hooper from
the U.S. Office of National Drug Control Policy's High-Intensity Drug Trafficking Area
Program ("HIDTA").[2]  (Doc. # 42, at 3, ¶ 7; Doc. # 77, at 2, ¶ 7.)

On or about February 13, 2008, an anonymous letter was sent to Dan Tang
informing him of the investigation.  (Doc. # 42, at 3, ¶ 8; Doc. # 77, at 2, ¶ 8; Doc. # 94,

---

[2]   The Court takes judicial notice of the fact that HIDTA is a program within the Office
of National Drug Control Policy.  *See* http://www.whitehousedrugpolicy.gov/hidta/overview.html
(last visited June 21, 2011); *see also* Fed. R. Evid. 201(b) (stating that judicial notice may be
taken of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and
ready determination by resort to sources whose accuracy cannot reasonably be questioned");
*O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not
uncommon for courts to take judicial notice of factual information found on the world wide
web.").

Ex. 18.)  Because of the leak, the NMTF and DEA quickly raided and took down the marijuana growing operation.  (Doc. # 42, at 3, ¶ 9; Doc. # 77, at 2, ¶ 9.)

The DEA then began investigating the source of the leak ("DEA investigation"), first investigating its own agents, and then beginning an investigation of officers within the NMTF.  (Doc. # 42, at 3-4, ¶¶ 10-13; Doc. # 77, at 2, ¶ 10-13; Doc. # 103, at 1-2, ¶ 10.)  NMTF supervisors told NMTF personnel that they each could decide for themselves whether to cooperate with the DEA investigation.  (Doc. # 42, at 4, ¶ 14; Doc. # 77, at 2, ¶ 14.)

Both Joyce and Lopez suspected that the anonymous letter was authored by Defendant Carbone, and informed others of their beliefs.  (Doc. # 42, at 4-5, ¶¶ 15, 20; Doc. # 77, at 2-3, ¶¶ 15, 19-20; Doc. # 103, at 2, ¶ 19.)[3]  Joyce and Lopez also began speaking out about issues related to the DEA investigation, including the importance of finding the source of the leak and cooperating with the DEA investigation, and about alleged corruption within the NMTF leadership pertaining to the leak and the DEA investigation.  (Doc. # 42, at 5-9, ¶¶ 21, 26; Doc. # 77, at 3, ¶ 21, 5, ¶ 26, 14-16, ¶¶ 5-6; Doc. # 103, at 5-7, ¶¶ 5-6; Doc. # 121, at 5, ¶¶ 5-6.)  Joyce and Lopez engaged in such speech to NMTF personnel and DEA investigators, while Joyce also spoke out to IRS Agent Valdez and HIDTA Analyst Hooper.  (*Id.*)[4]

---

[3]   The parties dispute the strength of Joyce and Lopez's suspicions about Carbone. (*See* Doc. # 42, at 4, ¶¶ 16-17; Doc. # 77, at 3, ¶¶ 16-17; Doc. # 103, at 2, ¶¶ 16-17.)

[4]   The Court discusses these instances of speaking out by Joyce and Lopez in more detail *infra.*

Plaintiffs allege that, because of their speaking out about the DEA investigation and corruption within the NMTF, they began suffering numerous acts of retaliation. (Doc. # 42, at 11-17, ¶¶ 34, 35, 38; Doc. # 77, at 9-10, ¶¶ 34, 35, 38, *id.* at 17-20, ¶¶ 7-8; Doc. # 103, at 3-4, ¶¶ 35, 38; *id.* at 7-9, ¶¶ 7-8; Doc. # 121, at 5, ¶¶ 7-8.)  As to Joyce, the alleged acts of retaliation included being put on a performance plan, being pulled off of part of the Tang investigation, being subjected to a hostile environment, and Van Houten failing to stop the retaliation after being informed of it.  (Doc. # 42, at 11-16, ¶¶ 34-35; Doc. # 77, at 9-10, ¶¶ 34-35, *id.* at 17-19, ¶ 7; Doc. # 103, at 3, ¶ 35; *id.* at 7-8, ¶ 7; Doc. # 121, at 5, ¶ 7.)  Joyce alleges that he resigned from the NMTF in the beginning of August 2008 "because of the actions taken against him."  (Doc. # 77, at 19, ¶7.g.; *see also* Doc. # 83, Ex. 2 at 496:3 - 497:1; Doc. # 103, at 8, ¶ 7(g).)  As to Lopez, the alleged acts of retaliation included being subjected to a hostile work environment, being given a low performance evaluation, and being involuntarily transferred out of the NMTF in September 2008.  (Doc. # 42, at 16-17, ¶ 38; Doc. # 77, at 10, ¶ 38, *id.* at 19-20, ¶ 8; Doc. # 103, at 4, ¶ 38; *id.* at 8-9, ¶ 8; Doc. # 121, at 5, ¶ 8.)

On March 19, 2010, Plaintiffs filed this 42 U.S.C. § 1983 action alleging that Defendants retaliated against them for exercising their First Amendment right to freedom of speech.  (Doc. # 1.)  Defendants' pending motions argue that summary judgment is appropriate because, under the *Garcetti/Pickering* test, discussed *infra*, Plaintiffs' speech was made pursuant to their official duties (not as private citizens), Plaintiffs' speech did not involve matters of public concern, the balancing of interests

favors Defendants, and Plaintiffs did not suffer any adverse employment actions.  (*See* Doc. ## 41, 43, 47-49.)[5]

## II.   STANDARD OF REVIEW ON SUMMARY JUDGMENT

The purpose of a summary judgment motion is to assess whether trial is necessary.  *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if, under the applicable substantive law, "it is essential to the proper disposition of the claim."  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Id.* (citing *Anderson*, 477 U.S. at 248).  In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to

---

[5]  They also argue, *inter alia*, that the individual defendants are entitled to qualified immunity, and that there is no basis for municipal liability as to the governmental entity defendants.  (*See* Doc. ## 41, 43, 47-49.)

the nonmoving party.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Id.* at 670–71 (citing *Celotex Corp.*, 477 U.S. at 325).  A movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out a lack of evidence for the nonmoving party on an essential element of that party's claim.  *Id.* at 671 (citing *Celotex Corp.*, 477 U.S. at 325).

If the movant meets this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also Adler*, 144 F.3d at 671 n.1 (discussing shifting burdens on summary judgment).  The nonmoving party may not simply rest upon its pleadings to satisfy its burden; instead, the nonmoving party must "'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (quoting Fed. R. Civ. P. 56(e)). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## III.   **ANALYSIS ON SUMMARY JUDGMENT**

To prevail on their 42 U.S.C. § 1983 claims, Plaintiffs must establish that there was a deprivation of a federal or constitutional right by a person acting under color of state law.  *See* 42 U.S.C. § 1983; *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). This case hinges on whether Defendants deprived Plaintiffs (through acts of retaliation) of their freedom of speech under the First Amendment.

In analyzing Plaintiffs' First Amendment retaliation claims, the Court applies the five-step inquiry established by the United States Supreme Court in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), and modified by *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (the "*Garcetti/Pickering* test").  The first three steps of the *Garcetti/Pickering* test involve questions of law to be decided by the Court, while the final two steps involve questions of fact normally reserved for the jury.  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202-03 (10th Cir. 2007) (discussing *Garcetti/Pickering* test).  Thus, the Court proceeds through the first three steps and must determine:

> 1.   Whether the plaintiff's speech was made pursuant to his official duties, or whether he spoke as a citizen.  If the speech was made pursuant to his official duties, there is no constitutional protection and the inquiry ends.  If the speech was made as a citizen, the analysis proceeds to step two.
>
> 2.   Whether the subject of the speech was a matter of public concern.  If it was not a matter of public concern, there is no constitutional protection.  If it was a matter of public concern, the analysis proceeds to step three.
>
> 3.   Whether the plaintiff's interest in commenting on the issues outweighs the interest of the governmental entity as employer.  If not, the inquiry ends.  If so, the analysis proceeds to step four.

8

*Id.* Under the fourth step, the plaintiff must show that his speech was a substantial or motivating factor in a detrimental employment decision. *Id.* And finally, if his speech was a substantial or motivating factor in the decision, the defendant may still avoid liability if it demonstrates that it would have taken the same action even in the absence of the protected speech. *Id.*

Based on the first prong of the *Garcetti/Pickering* test, Defendants argue that Plaintiffs' speech regarding the DEA investigation and corruption in the NMTF was pursuant to their official duties, not as citizens, and therefore is not entitled to constitutional protection. (*See* ECF No. 41, at 3-7; ECF No. 47, at 6-11; *see also* ECF No. 43, at 4-5; ECF No. 48, at 6-8; ECF No. 49, at 5-6.)

The Supreme Court in *Garcetti* declined "to articulate a comprehensive framework for defining the scope of a [public] employee's duties in cases where there is room for serious debate." 547 U.S. at 424. The Tenth Circuit has also declined to create "a set of bright lines rules," *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010), indicating that courts "must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Brammer-Hoelter*, 492 F.3d at 1204. However, generally, the Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to a [public] employee's official duties." *Rohrbough*, 596 F.3d at 746.

In evaluating whether the speech was made pursuant to official duties, courts should look "both to the content of the speech, as well as the employee's chosen

audience . . . ." *Id.* at 746.  In examining the content of the speech, Tenth Circuit

decisions have expressed various tests and factors to consider.  One decision framed

the issue as dependent on whether the speech "stemmed from and [was of] the type . . .

that [the employee] was paid to do." *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801

(10th Cir. 2007).  Another considered whether the speech "reasonably contributes to or

facilitates the employee's performance of [an] official duty." *Brammer-Hoelter*, 492 F.3d

at 1203.  In a case involving reporting wrongdoing, it is important to analyze whether the

employee's job responsibilities involved reporting such wrongdoing.  *See Reinhardt v.*

*Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1136 (10th Cir. 2010).  However,

speech may still be pursuant to official duties even if it "concerns an unusual aspect of

an employee's job that is not part of his everyday functions," *Brammer-Hoelter*, 492

F.3d at 1203, and the speech need not be "explicitly required as part of [the employee's]

day-to-day job responsibilities," *Green*, 472 F.3d at 800-01.  In addition, *Garcetti*

suggested that a government employee's speech is not protected where "there is no

relevant analogue to speech by citizens who are not government employees."  547 U.S.

at 424; *see also id.* at 421 (focusing on whether the speech "owes its existence to [the]

employee's professional responsibilities).

      In terms of the employee's chosen audience for the speech, the primary focus

is on whether the employee spoke to individuals outside of the employee's chain of

command.  *See Reinhardt*, 595 F.3d at 1136.  "Speech directed at an individual . . .

within an employee's chain of command is often found to be pursuant to that

employee's official duties," while "speech directed at an individual outside of an employee's chain of command is often outside of an employee's official duties." *Rohrbough*, 596 F.3d at 747.  However, "an employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech.  Rather, . . . the proper focus is ultimately still whether the speech stemmed from and was of the type that the employee was paid to do . . . ."  *Id.* (citation, brackets, ellipses, and quotation marks omitted).

The Court's first task here is to identify the speech by Plaintiffs that underlies their retaliation claims.  Viewing the evidence in a light most favorable to Plaintiffs, both Plaintiffs spoke out within the NMTF (to fellow detectives and/or to members of the NMTF leadership) about the importance of finding the source of the leak, the importance of cooperating with the DEA investigation, and alleged corruption within the NMTF leadership (both regarding Sergeant Carbone being the source of the leak, and that numerous other members of the NMTF leadership were trying to make the DEA investigation "go away" and trying to protect the source of the leak).  (Doc. # 42, at 5-9, ¶¶ 21, 26; Doc. # 77, at 3, ¶ 21, 5, ¶ 26, 14-16, ¶¶ 5-6; Doc. # 103, at 5-7, ¶¶ 5-6; Doc. # 121, at 5, ¶¶ 5-6; Doc. # 42, Ex. B at 39:10 - 40:5, 47:22 - 48:4, 430:15-24; Doc. # 42, Ex. C at 3; Doc. # 44, Ex. D, at 75:4 - 76:3, 342:21 - 344:13; Doc. # 44, Ex. E, at 3.)

Both Plaintiffs also spoke to DEA investigators about the leak and the DEA investigation.  Plaintiff Joyce told DEA investigators, among other things, that he thought the leak was Carbone.  (ECF No. 77, at 14, ¶ 5.a; ECF No. 103, at 5, ¶ 5.a;

ECF No. 84, Ex. 2, at 351:12-23.)  Plaintiff Lopez told DEA investigators that he

believed the leak was Carbone and that there seemed to be absolutely no interest at the

NMTF in finding the source of the leak.  (ECF No. 77, at 16, ¶ 6.a; ECF No. 103, at 6, ¶

6.a; *see also* ECF No. 84, Ex. 8, at 64:1 - 65:8; 130:23 - 131:16)  Joyce also spoke to

IRS Agent Valdez and HIDTA Analyst Hooper about the leak and the DEA investigation.

Specifically, Joyce told both Valdez and Hooper that he thought the NMTF leadership

was trying to make the DEA investigation "go away," and that it was corrupt for the

NMTF to assign two of Carbone's associates to assist in the DEA investigation.  (ECF

No. 42, at 5 ¶ 21.b; ECF No. 77, at 3 ¶ 21; *id.* at 14 ¶ 5.c; ECF No. 103, at 5-6 ¶ 5.c;

ECF No. 42, Ex. B at 39:25 - 46:20)

The parties frame the issue – whether Plaintiffs' speech was pursuant to their

official duties – as whether Plaintiffs had a general duty as police officers to investigate

and report potential crimes and assist other law enforcement agencies in their

investigations.  (*See, e.g.*, Doc. # 41, at 4-5; Doc. # 72, at 13-14.)  There is some

support in the law to conclude that, based on this general duty, a police officer speaks

pursuant to his official duties when he speaks out about potential criminal activity of any

kind.  *See Huppert v. City of Pittsburg*, 574 F.3d 696, 707 (9th Cir. 2009) (holding that

officer's speaking out about corruption with the police department was pursuant to

official duties because California law requires police officers to investigate corruption so

as to prevent the commission of crime and assist in its detection); *see also Kelln v.*

*Colo. Dep't of Revenue, Motor Vehicle Div.*, 719 P.2d 358, 360 (Colo. App. 1986)

("Police officers [in Colorado] have a general duty to look out for violations of the law and to report them."). Plaintiffs point out that, "taken to its logical conclusion, [this] would mean that no police officer anywhere could ever speak out about police misconduct" without it being considered pursuant to his official duties, and therefore constitutionally unprotected. (Doc. # 72, at 14.) However, the Court need not reach this more general issue of whether police officers speak pursuant to their official duties when they report *any* kind of wrongdoing, even if the wrongdoing is far different than the type the officer was hired to investigate.[6]

The fact of the matter is that here, Plaintiffs' speech related to wrongdoing directly impacting their ability to carry out their official duties. Viewing the evidence in a light most favorable to Plaintiffs, Plaintiffs were detectives for the NMTF, a law enforcement agency created to conduct investigations in order to combat illegal drug activity in the community.[7] Joyce himself initiated the Tang investigation and worked with DEA agents, IRS Agent Valdez, and HIDTA Analyst Hooper as part of the

---

[6]   For example, an officer hired to investigate drug crimes who decides to speak out about a fellow officer who, for example, cheated on his taxes, drove while intoxicated without injuring anyone, or holds an off-duty job as a private bodyguard where there is a state law prohibiting such moonlighting by officers.

[7]   The Court takes judicial notice of the NMTF's website, which states, "The purpose of the [NMTF] is to promote the safety, security and general welfare for the citizens of the North Metro area. . . .  The [NMTF], in an effort to combat illicit drug activity, works directly with the Police, Sheriff's, . . . [and] EPA, [among others]." *See* http://www.nmtf.us/index.htm (last visited June 30, 2011); *see also* Fed. R. Evid. 201(b); *O'Toole*, 499 F.3d at 1225.  The NMTF's website also states, "The [NMTF] is the focal point for drug investigations within Adams County and Broomfield County and as such has set an unwritten goal of maintaining a highly trained and competent staff." *See* http://www.nmtf.us/aboutus/aboutus.htm (last visited June 30, 2011).

investigation.  A leak informed Tang about the investigation, obviously compromising the investigation.  Plaintiffs' speech at issue was made for purposes of finding the source of the leak, getting the source of the leak punished in some way (fired and/or prosecuted), and rooting out individuals at the NMTF who were protecting the source of the leak.

There a sufficient nexus between the speech at issue (and its purpose) and the Plaintiffs' primary job duties of investigating illegal drug activities and getting drug suspects prosecuted and convicted.  If an NMTF officer leaks information to the drug suspects themselves, Plaintiffs will be less effective at performing their job duties of investigating those suspects and getting them prosecuted and convicted.  If the NMTF leadership interferes with investigations into those leaks, the sources of the leaks will not be caught and the Plaintiffs' drug investigations could continue to be compromised in the future.  Thus, Plaintiffs' speech regarding the need to find the source of the leak and the NMTF leadership's alleged cover-up of the leak are directly related to Plaintiffs' job duties.  This is particularly true for Joyce, whose own investigation was compromised by the leak at issue, but it is also true for Lopez, who was speaking out more generally as an NMTF detective trying to root out corruption at the NMTF and protect NMTF detectives from harm.  (*See* Lopez's interrogatory response at Doc. # 44, Ex. E, at 3 (stating his opinion that "it would be hard for the NMTF to operate . . . if the culprit wasn't identified and dealt with"); Lopez's deposition testimony at Doc. # 84,

Ex. 8 at 69:9-10 (stating the importance of "try[ing] to find out who was the leak of information and who put us all in jeopardy"))

Further supporting this conclusion is the fact that Plaintiffs, in their positions with this specialized law enforcement task force, were privy to inside information concerning the leak, and had inside access to DEA investigators, IRS Agent Valdez, and HIDTA Analyst Hooper.  Therefore, it can be easily concluded that "there is no relevant analogue to [their] speech by citizens who are not government employees [of this specialized task force]," and that this inside information and access "owe[d] its existence to [their] professional responsibilities."  *Garcetti*, 547 U.S. at 424.

In terms of the audience of Plaintiffs' speech, Plaintiffs focus on the fact that some of their speech was directed to individuals outside of their chain of command at the NMTF and local police departments, namely, DEA agents, IRS Agent Valdez, and HIDTA Analyst Hooper.  However, it is important to note that the DEA, Valdez, and Hooper all actively participated in the original Tang investigation, collaborating with Joyce and other NMTF officers.  In a sense, they were all co-workers in that endeavor, despite the fact that they were employed by different agencies.  (*See* Doc. # 113, Ex. 28, ¶ 3 (Joyce's declaration stating, "I worked with both [Valdez and Hooper] on an almost daily basis while I was at the Task Force. . . .  I was in almost constant communication with Hooper and kept her well informed about the [Tang] case information, including the leak and the leak investigation."))  Plaintiffs' speech to these employees of other agencies regarding the leak was directly related to their prior

15

collaborative work on the Tang investigation.  Under the circumstances, the Court does not find Plaintiffs' arguments regarding speaking out to individuals outside of their formal chain of command to be persuasive.  *See Rohrbough*, 596 F.3d at 747 ("[A]n employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech.  Rather, . . . the proper focus is ultimately still whether the speech stemmed from and [was of] the type . . . that [the employee] was paid to do . . . .") (citation, brackets, ellipses, and quotation marks omitted).

Viewing the evidence in a light most favorable to Plaintiffs, the Court concludes as a matter of law that Plaintiffs' speech, including that made to DEA investigators, IRS Agent Valdez, and HIDTA Analyst Hooper, was made pursuant to their official duties as members of the NMTF, and not as private citizens.  Therefore, there is no triable issue as to the first element of the *Garcetti/Pickering* test, and summary judgment is appropriate.[8]

## IV.   OTHER PENDING MOTIONS

Also pending before the Court are (1) Defendants' Objection to U.S. Magistrate Judge Michael J. Watanabe's order granting Plaintiffs' motion to compel certain discovery (Doc. # 127), and a motion *in limine* filed by three defendants (Doc. # 129).

In terms of the objection to the magistrate judge's discovery order, the Court concludes that the discovery at issue is not relevant to the Court's bases for summary

---

[8]   Because the Court concludes that summary judgment is appropriate on the ground that Plaintiffs spoke pursuant to their official duties, the Court need not address the other bases for summary judgment advanced by Defendants.

16

judgment described above, and therefore would not have impacted the Court's decision on summary judgment.  *See Felix v. City and Cnty. of Denver*, 729 F. Supp. 2d 1243, 1266-68 (D. Colo. 2010) (denying as moot objections to magistrate judge's discovery orders because "the requested information [sought in discovery] . . . would not alter the results of the [court's] summary judgment analysis").  In their Response to Defendants' Objection, Plaintiffs contend that the discovery is relevant to the issue, briefed by Defendants in their summary judgment motions, of whether a reasonable person in the government employee's shoes would have believed that there was corruption or wrongdoing within the NMTF.  (*See* Doc. # 128, at 2, 7.)  Whether a reasonable person would have believed there was corruption at the NMTF is in no way relevant to whether Plaintiffs' spoke pursuant to their official duties, the issue that forms the basis for the Court's summary judgment.  Accordingly, the Court denies as moot Defendants' Objection to the magistrate judge's discovery order.

The pending motion *in limine* is also mooted by the Court's summary judgment. *See Lewis v. Oklahoma ex rel. Bd. of Regents for Tulsa Cmty. Coll.*, 42 F. App'x 160, 173 n.14 (10th Cir. 2002) ("Because we affirm the district court's grant of summary judgment with respect to all claims, we also affirm that court's determination that [the plaintiff's] motions in limine were moot.").

## V.  <u>CONCLUSION</u>

Therefore, based on the foregoing, IT IS ORDERED THAT:

(1)     Defendants the City of Northglenn, Colorado and Russell Van Houten's Motion for Summary Judgment (Doc. # 41) is GRANTED;

(2)     Defendants North Metro Task Force and Richard Reigenborn's Motion for Summary Judgment (Doc. # 43) is GRANTED;

(3)     Defendants the City of Thornton, Colorado, James Nursey, and Dante Carbone's Motion for Summary Judgment (Doc. # 47) is GRANTED;

(4)     Defendant Timothy Hersee's Motion for Summary Judgment (Doc. # 48) is GRANTED;

(5)     Defendant Jack Bell's Motion for Summary Judgment (Doc. # 49) is GRANTED;

(6)     Defendants' Objection to Magistrate Judge's Order Regarding Plaintiffs' Motion for Order Compelling Production of Subpoenaed Documents and Testimony (Doc. # 127) is DENIED as moot;

(7)     Defendants City of Thornton, Nursey, and Carbone's Motion *in Limine* (Doc. # 129) is DENIED as moot; and

(8)     The Clerk of Court shall enter judgment in favor of Defendants.  The parties are to bear their own fees and costs.

DATED:  July   07  , 2010

BY THE COURT:

_____

CHRISTINE M. ARGUELLO
United States District Judge

18